Filed 5/11/15  In re H.W. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re H.W., et al., Persons Coming Under the Juvenile Court Law. | B259045 |
| | (L.A. Co. Super. Ct. No. CK93838) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. ANITA R. et al., Defendants and Appellants. | |

APPEALS from orders of the Superior Court of Los Angeles County, Stephen Marpet, Juvenile Court Referee.  Reversed and remanded as to Anita R. Dismissed as to James W.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant Anita R.

Terence M. Chucas, under appointment by the Court of Appeal, for Defendant and Appellant James W.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Melinda A. Green, Deputy County Counsel, for Plaintiff and Respondent.

_____

Anita R. (Mother), and James W. (Father) separately appeal from the juvenile court's orders denying a petition for modification under Welfare and Institutions Code[1] section 388 and terminating parental rights over their daughter H.W. under section 366.26. Mother contends the juvenile court abused its discretion in denying the section 388 petition because she demonstrated that her request for reinstatement of family reunification services for six months and liberalized visits was supported by a change in circumstances and the best interests of the child. Mother also argues the court should not have terminated parental rights because she demonstrated application of the beneficial parent-child relationship exception (§ 366.26, subd. (c)(1)(B)(i)) to the termination of her parental rights. For the reasons articulated below, we agree that the court erred in denying the section 388 petition, and accordingly reverse.[2]

### FACTUAL AND PROCEDURAL BACKGROUND

**A.** **The Family and Pre-Dependency Petition Contact with the Department of Children and Family Services**

The family subject of these proceedings consists of Mother, Father and their child

---

[1] Unless otherwise indicated all further code references are to the Welfare and Institutions Code.

[2] Father filed a separate notice of appeal. In his opening brief and reply, he joined in Mother's arguments. Father has not, however, asserted any additional or separate arguments with respect to a summary denial of his section 388 petition or the termination of his parental rights. As a result, Father has waived any claim with respect to the court's ruling on his section 388 petition by failing to assert any arguments on appeal. In addition, his challenge to the termination of parental rights is moot in view of our conclusion here that the order terminating parental rights must be reversed. (See *In re A.L.* (2010) 190 Cal.App.4th 75, 78-79 [holding that the reversal of juvenile court's denial of mother's petition for modification of the order terminating her reunification services had the effect of reinstating both parents' parental rights, because a decision on mother's petition for modification was a necessary antecedent to the holding of the hearing terminating both parents' parental rights].) Father's appeal is dismissed.

H.W., born in May 2012, and Mother's children from a prior relationship, James R. and Isaiah R.[3] At the time the family came to the attention of the Department of Children and Family Services (the Department) in late 2011, the parents had been in an "on and off" relationship for about 10 years, but had never married.

In November 2011, the Department received a report alleging physical abuse, emotional abuse, and general neglect of James and Isaiah. The referral alleged that Father had kicked Mother in her stomach while she was pregnant (with H.W.); that Father disciplined Isaiah by picking him up by his ears; and that Father gave James a black eye.

Although the children denied witnessing Father kicking Mother, they told the Department that the parents did push each other and fought. Both Mother and Father denied any instances of domestic violence. Nonetheless, Father conceded he had disciplined Isaiah in the manner reported. Father also admitted he smoked marijuana daily and according to his parole agent, Father also abused methamphetamine. The investigation further revealed the children were left in Father's care every night when Mother went to work. The Department decided to hold a team decision-making meeting (TDM) with the family. In the meantime, Father agreed to move out of the home, and Mother agreed to make arrangements for childcare of the children while she was at work.

At the TDM, in November 2011, it was decided that a Voluntary Family Maintenance Contract (VFM) would be created for the family. At the time, Mother indicated that she no longer wanted to be in a relationship with Father and would seek a restraining order. Mother reported that Father had moved out of the home but still visited often because she was pregnant with his child. The Department informed Mother that if she allowed Father to babysit or be alone with her children, the Department would

---

[3]    James (born in 2003) and Isaiah (born in 2006) are not parties to the appeal. Neither are their respective fathers. Isaiah was never removed from the care of his father, G.M., and on March 13, 2013, jurisdiction was terminated in Isaiah's matter after the juvenile court awarded G.M. sole physical custody and joint legal custody of Isaiah. James's Father, E.B., has never been located.

remove them from her custody. Mother signed a case plan, agreeing to complete individual counseling and address domestic violence programs; Father did not participate in the plan, but was warned that his child could be detained from him at birth.

In January 2012, Father enrolled in an inpatient drug treatment program, but shortly thereafter he tested positive for drugs and left the program. In February 2012, Father moved back in with the family, and agreed to the case plan including drug testing, and domestic violence counseling. Mother claimed that Father was never left alone with the children.

Father tested positive for drugs on a number of occasions and failed to comply with other plan requirements. Mother reported that Father would live with her on and off, and that he only used drugs while living with other people. In May 2012, the Department informed Mother that Father's failure to comply with the plan placed the children at risk.

H.W. was born in late May 2012. An unannounced visit to the family home shortly after H.W.'s birth revealed that Father was still residing there. Mother stated she remembered agreeing Father would not be alone with her sons, but Mother claimed that her family was not able to help her and that Father was her only childcare support. Another TDM was held. Father agreed to drug test, but refused to participate in a drug treatment program.

**B.     Dependency Proceedings**

**<u>Section 300 Petition and Detention Proceedings.</u>**  On June 7, 2012, the Department filed a petition under section 300, subdivisions (a), (b) and (j) with respect to the children. The petition alleged, in part, that Father physically abused Isaiah and James, and that Mother failed to protect them from that abuse; Father and Mother engaged in a physical altercation; and Father abused drugs, Mother was aware of Father's drug use, and allowed Father access to the children. The court ordered that the condition of H.W.'s release to her parents was that Father comply with the drug court program, submit to weekly random testing, and use no corporal punishment. The court further

4

ordered that Father was to immediately move out of the home if he tested positive for drugs, missed a drug test, or used corporal punishment.

Shortly thereafter, Father tested positive for both marijuana and cocaine, and the Department requested that Father move out of the home. On June 11, 2012, the Department filed an ex parte application pursuant to section 385, recommending that the juvenile court detain H.W. from Father and release her to her Mother. The court granted the application.

**Jurisdiction and Disposition Proceedings**. The jurisdiction and disposition report revealed that the parents pushed each other during an argument; that Father used corporal punishment on the boys, and yelled at Mother. During another fight Father threw a stroller in the street. The reports also revealed that Father was not complying with his substance abuse program and had tested positive for drugs.

On September 12, 2012, the juvenile court sustained an amended petition and found the children to be described by section 300.[4] James, Isaiah and H.W. were

---

[4]     The sustained petition states:

"[Amended (a-1), (b-1), (j-1)]: On 11/03/11, the children, [James], [Isaiah] and [H.W.]'s [mother's] male companion, . . . , father of the child [H.W.], inappropriately physically disciplined the child Isaiah by grabbing and pulling the child's ear, resulting in the [child] sustaining swelling, redness and an abrasion to that ear. The child's mother knew of the inappropriate physical discipline, in that [Father] did hit the child on prior occasions, but did not take effective action to protect the child. The child is afraid of [Father]. Such inappropriate physical discipline and mother's ineffective protection of the child place the child Isaiah and his siblings James and [H.W.] at risk of physical and emotional harm and damage.

"[Amended (b-3)]: The children [James], [Isaiah] and [H.W.]'s [mother's] male companion, . . . , father of the child [H.W.] has a history of and is a current user of methamphetamine, marijuana and cocaine, having had [ ] positive toxicology results for drugs on at least four occasions since May 24, 2011. Mother was aware of [Father's] drug use but allowed him to have unlimited access to the children. Such past and current drug abuse by [Father.], and mother's failure to protect the children place the children at risk of harm."

5

declared dependents of the juvenile court. James and H.W. remained in Mother's care, but were removed from their respective fathers' care. Reunification services were ordered for Father and family maintenance services were ordered for Mother. Father was ordered to have monitored visitation with H.W., was not allowed to visit H.W. in the home, and Mother was not allowed to monitor the visit. Mother had enrolled in a domestic violence program and attended weekly group sessions.

**Section 387 Petition.** On October 12, 2012, the Department filed a section 387 petition seeking to detain the children from Mother. The Department reported that it had discovered that Father continued to reside in the family home and that Mother had allowed him access to the children. Although Mother denied the claim, she consented to the removal of the children. James disclosed to the Department that Father struck him on the face with his hand and that Father could not control his anger.

Isaiah was released to his father. James and H.W. were placed with an extended family member, who indicated that she could not care for H.W. on a long term basis. The Department searched for homes that could accommodate both James and H.W. The dependency court ordered the children detained from Mother and she was ordered to have monitored visitation with the children.

In the Jurisdiction/Disposition Report for the section 387 petition filed December 12, 2012, the Department reported that both James and Isaiah stated they were exposed to Father's drug use in the home and that they were also "coached" to lie about the fact that Father was still residing in the home. James also reported that Father had physically abused him and his brother and that Mother witnessed some of the abuse.

James remained placed with the extended family member, and H.W. had been re-placed to a foster home. The Department reported that Mother had a good relationship with the children's caregivers and was visiting each child weekly.

In its interim review report filed February 11, 2013, the Department reported that Mother had completed a parenting program with perfect attendance and was still attending a domestic violence program. Mother had also been placed on a "waitlist" for individual counseling.

6

Both children were doing well in their respective placements. H.W.'s foster mother reported the parents visited consistently and sometimes visited together but that Father acted "weird" on occasions. The foster mother indicated that in her view, Mother enabled Father's negative behaviors during the visits. Father's drug dependency continued, and he dropped out of his drug treatment program. Mother informed the Department that she and Father planned to get married within a few weeks "despite [Father's] severe drug addiction."

At the adjudication hearing on February 11, 2013, the juvenile court sustained the section 387 petition, and ordered the children removed from Mother. Mother was ordered to receive family reunification services.

**Reunification Period**. In a review report filed March 13, 2013, the Department expressed concerns that Mother could not protect her children, because she remained in denial about the severity of Father's drug addiction and made excuses for his behavior.

The children remained in their placements. The foster mother reported Mother and Father would only visit for one hour and then say the baby was tired. The foster mother also reported that Father was harassing her and that she no longer wanted to serve as the monitor for the parents' visits with H.W.

In March 2013, Mother called the police to report that Father had physically attacked her. In May 2013, the court terminated Father's reunification services.

An August 2013 review report disclosed Mother had completed her domestic violence program and was enrolled in individual counseling, but continued to reside with Father. The Department stopped allowing the parents to visit the children at the same time. Thereafter, Mother visited H.W. and James together and the Department supervised the visits. The Department reported the parents continued to be engaged in an unhealthy relationship with chronic tension between them. The Department concluded Mother was in partial compliance with her case plan. In the Department's view, Mother had not shown she could appropriately protect her children as she continued to reside with Father, who had not addressed the issues that were the subject of the dependency proceedings.

7

In the fall of 2013, the children continued to do well in their placements. Both James's and H.W.'s respective caregivers were willing to adopt if Mother did not reunify with them. The Department reported that in October 2013, Mother had asked for assistance in seeking a restraining order against Father. Father was served with paperwork concerning the restraining order during a visit with H.W. Mother reported to the Department that she was attempting to move so that Father would not know her home location. Mother was having one monitored visit a week with James and H.W. at a park for two hours, and a second visit with each child separately. During visitation with James, Mother told him that she left Father. James stated he would live a "normal life" with Mother but only if Father was no longer in their lives.

Mother obtained a restraining order against Father in January 2014, and she found a new residence, which appeared to be clean and free of safety hazards. The maternal grandmother lived in the same complex as Mother and would be able to watch James and H.W. when Mother worked at night.

Mother reported that she had been separated from Father since October 2013 because of the domestic violence incident that occurred that month. Father was homeless and he occasionally stayed with his family. Father was arrested in March 2014. Nonetheless, in the Department's view, Mother's priority had been Father rather than her children. In a December 11, 2013 report, the Department expressed concerns that Mother had a history of reconciling with Father. The Department recommended Mother's reunification service be terminated at the next status review hearing.

At the contested status review hearing on March 5, 2014, Mother testified. After the conclusion of testimony and argument, the juvenile court terminated Mother's reunification services and scheduled a section 366.26 hearing.

**Mother's Section 388 Petition.** On June 30, 2014, Mother filed a section 388 petition requesting six additional months of family reunification services. In the "changed circumstances" portion, Mother wrote that she continued participating in services and had completed 45 domestic violence group therapy sessions and 29 individual counseling sessions. Mother stated the order would be in the children's best

interest so they "would continue to have a relationship with their biological mother." Mother supported her petition with a letter from her domestic violence program counselor who described Mother's consistent participation in the domestic violence group and individual counselling. The counselor wrote that Mother had exceeded the required number of recommended sessions in both group and individual counseling. The counselor described Mother's insight into issues related to her own traumatic upbringing which caused Mother to remain in an abusive relationship with Father. The letter also described the changes that Mother made to improve her life upon her realization of the codependency issues. The letter noted Mother's efforts to separate from Father, including obtaining a restraining order against him. The letter indicated that Mother had returned to the domestic violence group in March 2014 and had resumed individual counseling in April 2014.

On July 2, 2014, the juvenile court set Mother's section 388 petition for a hearing on September 16, 2014, and ordered the Department to prepare a report to address Mother's petition.

In its July 2, 2014 status review report, the Department reported that James continued to like his placement and wanted to live with his caregiver. James reported he liked to visit his Mother and play with H.W., but would only live with her if she had changed. H.W. appeared to be happy in her placement, and had a "healthy bond" with her caregiver. Both children's caregivers remained willing to adopt them. In the Department's view, it was likely Mother and Father would reconcile when he was released from incarceration.

Mother continued to visit both children together every Tuesday at a local park and visited H.W. an additional day of the week. Mother never missed a visit and began calling H.W. in between the visits. According to the Department's visitation monitor, the visitations went well. H.W. was excited to see Mother and her brother James at the beginning of the visit—she laughed and smiled. Mother brought restaurant food for half of the visits and home-cooked meals for the other half of the visits. Mother fed H.W., and they ate together. Mother carried H.W. around and engaged with the toddler. After

9

they ate, they all played well together. Mother kissed H.W. goodbye and strapped her into her car seat at the end of the visit.

The record does not contain any indication that the Department prepared a written response to Mother's section 388 petition; however the Department's section 366.26 report contains H.W.'s foster mother's perspective of the situation. According to the foster Mother, H.W. only called Mother "mom" once; she referred to the foster mother as "mom" and Mother by her first name. The foster mother stated that Mother had only recently begun buying clothes for the child and calling in between visits. Mother also kept all of the toys and other items she purchased for the toddler because she was setting up a room for the child in Mother's home. The foster mother claimed that H.W. did not want to attend visits with Mother—she cried and refused to leave the caregiver. The caregiver believed that Mother did not change the toddler's diapers during the two-hour visits, though Mother claims she did. The caregiver did not believe Mother watched the child closely during the visits. The foster mother opined the child was attached to her foster parents and well-adjusted emotionally in their home. In the foster parent's view, the toddler would "suffer" if separated from them. The foster mother admitted, however, that H.W. had a relationship with Mother, but that it is "not that strong." The foster mother believed that in a home environment different from her home, H.W.'s "wellbeing would regress." H.W.'s foster parents were committed to adopting H.W. and were not interested in a post-adoption contact agreement.

**Section 388 and Section 366.26 Hearings.** The hearing on Mother's section 388 petition and the section 366.26 termination hearing were scheduled for September 16, 2014. At the outset of the proceeding, the dependency court stated that it had received a section 388 petition from Father filed that day, in which he requested additional family reunification services. The juvenile court summarily denied the petition, concluding Father had not shown a change of circumstances or that the modification would serve H.W.'s best interest.

The court then considered Mother's section 388 petition and began to announce the court's ruling on the petition. Mother's counsel interrupted the court and asked for an

10

opportunity to present an argument. The court initially refused, and then eventually allowed Mother's counsel to make a record. Mother's counsel urged the court to grant Mother's petition for six additional months of reunification services for both James and H.W. The children's lawyer joined in the request with respect to James, but "submitted" with respect to H.W. expressing the view that the "best interest prong" of the section 388 test had not been met as to H.W. The Department's counsel reminded the court that the proceeding was now at the 366.26 phase, and stated the Department was opposed to the petition. The Department's argument focused on the section 366.26 elements: "these two children appear to be very differently situated. [H.W.] has not been in the parents' care. They could not possibly, I feel, make a substantial [366].26 argument for any sort of exception. They don't stand in a parental role, and I don't see that there's any way the court can find a changed circumstance or best interest as to [H.W.]."

The court then proceeded to rule on the petition. With respect to James, the court found that Mother had demonstrated a sufficient change of circumstances and that it would be in the minor's best interest to provide Mother with six more months of reunification with him, including counseling, therapy and increased visitation. With respect to H.W., the court ruled: "As I've indicated, [H.W.] does not come and rise to the level of minor's best interest on the two prong test under 388, so the 388 as to [H.W.] is denied."

The court then immediately turned to the section 366.26 proceeding. Mother objected to the termination of her parental rights as to H.W., and asserted that she met the parental relationship exception to the termination of parental rights under section 366.26, subdivision (c)(1)(B)(i), and the sibling relationship exceptions. The court found that the exceptions did not apply and terminated parental rights to H.W.

Both Mother and Father filed appeals.

### DISCUSSION

On appeal, Mother argues the juvenile court abused its discretion in denying her section 388 petition and thereafter, erred in ordering the termination of her parental rights over H.W. We agree.

11

Under the 14th Amendment, a parent has a liberty interest in the care, custody and management of his or her children. (*In re Sade C.* (1996) 13 Cal.4th 952, 987.) Likewise, a child has a liberty interest to live in a home with his or her parents, if possible, or at least in a home that is stable. Prolonged uncertainty over whether a child is to remain in his current home is detrimental to a child's development. (*Id.* at pp. 988–989.) For this reason, after reunification services have been terminated, the child's interest in a stable and permanent placement is paramount and reunification is no longer the guiding principle. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348.)

Nonetheless, section 388 permits the juvenile court, "upon grounds of change of circumstance or new evidence . . . to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court," including prior orders terminating reunification services. (§ 388, subd. (a).) The statute allows the modification of a prior order only when the petitioner establishes by a preponderance of the evidence that (1) changed circumstances or new evidence exists; and (2) the proposed modification would promote the best interests of the child. (*In re L.S.* (2014) 230 Cal.App.4th 1183, 1193; *In re Stephanie M.* (1994) 7 Cal.4th 295, 317; *In re Jasmon O.* (1994) 8 Cal.4th 398, 415; Cal. Rules of Court, rule 5.570(e).) The section 388 modification procedure is an "'escape mechanism' when parents complete a reformation in the short, final period after the termination of reunifications services but before the actual termination of parental rights," which is "vital to the constitutionality of our dependency scheme as a whole, and the termination statute, section 366.26, in particular." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 528; *In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)

An appellate court reviews the juvenile court's decision concerning a section 388 petition for abuse of discretion, and it is rare that the denial of a petition under section 388 merits reversal. (*In re Kimberly F., supra,* 56 Cal.App.4th at p. 522; *In re Stephanie M., supra*, 7 Cal.4th at p. 317.) We do not inquire whether substantial evidence would have supported a different order, nor do we reweigh the evidence and substitute our judgment for that of the juvenile court. (*Ibid.*) At the outset, however, we must determine whether the juvenile court applied the correct legal standard to the issue in

exercising its discretion, which is a question of law for this court. "The scope of discretion always resides in the particular law being applied; action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an abuse of discretion." (*Choice-In-Education League v. Los Angeles Unified School Dist.* (1993) 17 Cal.App.4th 415, 422.)

### A.    Changed Circumstances

A parent seeking relief under section 388 "must show changed, not changing, circumstances. [Citation.] The change of circumstances or new evidence 'must be of such significant nature that it requires a setting aside or modification of the challenged prior order.' [Citation.]" (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615.)

In this case, the only reasonable inference from the evidence is that Mother demonstrated changed circumstances. She had ended her relationship with the Father and had been separated from him for almost a year by the time of the hearing on the section 388 petition. Although the Department speculated Mother would reunite with Father when Father was released from incarceration, there is nothing in the record to support the Department's conjecture. Mother had already broken off their relationship and moved to an address so that Father could not locate her. In the fall of 2013, she served Father with restraining order documents and thereafter, obtained a restraining order against him that will remain in effect until 2017. Mother had taken all of these actions prior to Father's most recent arrest. In addition, there was no evidence in the record to indicate that in the period between the termination of reunification services and the hearing on the petition that Mother and Father had resumed their relationship or had any plans to do so.

Mother also had completed a domestic violence program and had complied with every aspect of her case plan. At the time the court terminated her reunification services, Mother rejoined the domestic violence group sessions and resumed individual counselling. By the fall of 2014, Mother had completed more than the required number of domestic violence group sessions and individual counseling sessions and had developed insight into her behaviors which had caused her to be involved in abusive relationships. She had a clean and safe home, steady employment and support from the

13

maternal grandmother who lived in the same complex and was available to assist Mother with childcare. In short, the changes that Mother had begun prior to the termination of her reunification services had, by the time of the hearing on the section 388 petition, taken hold.

In reaching the conclusion that Mother met her burden to prove changed circumstances, we also find it compelling that the court found "changed circumstances" with respect to Mother's 388 petition seeking reinstatement of reunification services with James. In this case, the circumstances that gave rise to dependency proceedings concerned the Father's addictive behaviors and his abusive treatment of family members. Other than the allegation that Mother did not protect her children from Father's abuse, the section 300 petition did not contain specific allegations concerning Mother's individual relationships with the children or her conduct towards them. The requisite "change" relevant in the section 388 petition focused on the Mother's efforts to address those case issues. Thus, the court's conclusion that Mother had demonstrated changed circumstances sufficient to support her section 388 request with respect to James, should also pertain to her request with respect to H.W. Indeed, the dependency court appeared to reach that conclusion as well because in denying the section 388 petition with respect to H.W. the court only articulated that Mother's request did not meet the "best interest prong," of section 388; the court did not find that Mother had failed to demonstrate a change of circumstance.

**B. Best Interest of H.W.**

Of course, "'[i]t is not enough for a parent to show just a genuine change of circumstances under the statute. The parent must show that the undoing of the prior order would be in the best interests of the child. [Citation.]'" (*In re S.J.* (2008) 167 Cal.App.4th 953, 960.) Determining whether granting a section 388 petition and modifying a prior order are in a child's best interest "calls for a case-by-case analysis, not a mechanical rule." (*In re Justice P.* (2004) 123 Cal.App.4th 181, 191; *In re Kimberly F., supra,* 56 Cal.App.4th at p. 530 ["best interests is a complex idea" that requires consideration of a number of factors].) Although the focus in a dependency proceeding

14

after termination of reunification services shifts from the parent's custodial interest to the child's need for permanency and stability (*In re Stephanie M., supra,* 7 Cal.4th at p. 317*; In re Marilyn H., supra,* 5 Cal.4th at p. 309), permanence and stability cannot be the sole factors considered in ruling on a parent's section 388 petition because denial of the petition would always further those goals.

The child's bond with the foster parents as compared to the party seeking modification, the child's emotional state, the presumption favoring natural parents and the benefit to the child of establishing or maintaining a relationship with siblings must also be evaluated. (See *In re Stephanie M., supra*, 7 Cal.4th at p. 325 [juvenile court properly weighed factors to determine child's best interest; "essence of the juvenile court's ruling was that the child was fragile, that she had a strong healthy bond with the foster mother, and essentially no bond with the grandmother despite the opportunities that had been available to the grandmother to create such a bond"]; *In re Justice P., supra,* 123 Cal.App.4th at p. 192 [in determining whether evidentiary hearing was warranted on section 388 petition, juvenile court considered presumption favoring natural parents and interest in continuing relationship among siblings]; cf. *In re Kimberly F., supra,* 56 Cal.App.4th at pp. 529-530 [simple comparison between socioeconomic status of natural parents and caretakers "ignores all familial attachments and bonds between father, mother, sister and brother, and totally devalues any interest of the child in preserving an existing family unit, no matter how, in modern parlance, 'dysfunctional'"; italics omitted].) Also relevant, are the "seriousness of the problem which led to the dependency, and the reason for any continuation of that problem" and "the degree to which the problem may be easily removed or ameliorated, and the degree to which it has been." (*Id.* at p. 532.)[5]

---

[5]     Case law, post *Kimberly F.*, has distilled the analysis of "best interest" into three factors: (1) the seriousness of the problem leading to dependency jurisdiction; (2) the degree to which that problem has been resolved, and why it was not resolved sooner; and (3) the relative strength of the bonds between the child and the parent and the child and the caretakers. (See *In re Jacob P.* (2007) 157 Cal.App.4th 819, 832 [listing factors for

The court's denial of the 388 petition with respect to H.W. based on a conclusion that Mother had not satisfied the "best interest" prong of section 388 is troublesome in several respects. First, based on the record before this court, it is unclear which of the legal factors the dependency court considered, if any. We cannot accord deference to the exercise of a trial court's discretion unless it appears that court exercised its discretion and applied the correct legal standard in doing so. Here, the court gave no indication of how it reached its decision that additional services would not be in the best interest of H.W. The court summarily announced its ruling on the petition, providing Mother's lawyer a brief opportunity to "make a record" only after counsel reminded the court that the matter was scheduled for a hearing. The court did not explain or amplify the reasons it granted the petition for reunification services as to James, but denied it with respect to H.W. The failure to articulate a rationale, coupled with the Department's emphasis on the section 366.26 legal standards during oral argument, raises doubts as to whether the court applied the correct legal standard. (See *In re Hashem H.* (1996) 45 Cal.App.4th 1791, 1801 [Evidence and arguments presented in a section 366.26 proceeding are not a substitute for a hearing on appellant's section 388 petitions].)

Nevertheless, the court's failure to expressly identify the legal reasons and the evidence it relied upon would not necessarily warrant reversal, if the basis of the court's decision can be inferred from the evidence in the record. Here the second cause for concern is that considering the appropriate factors, the record does not support the court's decision to deny the petition. Analyzing the *Kimberly F.* factors in this case, the only reasonable inference from the evidence in the record before the dependency court is that additional reunification services would be in H.W.'s best interest.

First, some conditions that lead to dependency jurisdiction are more serious than others. For example, in *In re Kimberly F., supra,* 56 Cal.App.4th at page 521, the court held that dependency jurisdiction based on an unsanitary home was not as serious as

---

evaluating section 388], citing *In re Kimberly F., supra*, 56 Cal.App.4th at p. 532*; In re D.R.* (2011) 193 Cal.App.4th 1494, 1512 [listing factors].) These are often referred to as the "*Kimberly F.* factors." (See *In re J.C.* (2014) 226 Cal.App.4th 503, 527.)

sexual abuse, physical abuse or illegal drug use. In this case, although domestic violence committed by Father and the Father's substance abuse problems were certainly serious problems, Mother (and James and Isaiah) were the victims; Mother was not the perpetrator of the violence which led to dependency jurisdiction over H.W. As best we can tell, the last reported incident of domestic violence between Mother and Father occurred in March 2013, a year before the reunification services were terminated. Under the unique circumstances of this case, the domestic violence which led to dependency jurisdiction over H.W. was less serious than if Mother had perpetrated the abuse or if H.W. had been actually harmed.

Second, by the time of the section 388 petition hearing in September 2014, there is no dispute that Mother's issues with recognizing and protecting herself and her children from domestic violence had been resolved. As described above with respect to the changed circumstances, Mother was no longer involved with Father, and had finally broken off her relationship with him in the fall of 2013. Mother had completed all of the court-ordered domestic violence and individual counseling programs, participating in sessions above and beyond those required by her case plan. In fact, the juvenile court was sufficiently confident that domestic violence was no longer an issue and that Mother had finally separated from Father such that it granted the section 388 petition granting Mother's additional reunification services as to James.

With respect to the time it took Mother to resolve her domestic violence issues, the Department blamed Mother's failure to do so sooner on Mother's inability to end her relationship with Father, notwithstanding her knowing that Father had failed to address his substance abuse or case plan issues. The Department raises a serious concern. The evidence is undisputed that Mother did not fully separate herself from Father until her children were removed from her custody. Indeed, from the time the Department became aware of the family in late 2011 until the jurisdiction/disposition proceedings in February 2013, Mother and Father had continued to engage in a pattern of separating and then reuniting as they had done for the prior 10 years. In addition, even after H.W. was removed from Father, and the Department directed Mother not to provide Father access

17

to the children, Mother continued to allow Father into the family home.  However, within six months of the children's removal from Mother, she was finally able to completely break off her relationship from Father.  By the 12-month review hearing Mother had obtained a restraining order, and moved to a different location.  As of the hearing on the section 388 petition, she had not been in contact with Father for almost a year.  On this record, it is unfair to say that Mother did not address the problem of domestic violence that led to dependency jurisdiction over H.W. and James.

The third factor is the relative strength of the bonds between the child and the caretaker and the child and the parent.  There is no question that as of the 388 hearing, the foster parents had done an excellent job caring for H.W.  The child had thrived in almost two years she had lived with them, and they wanted to adopt her.   Nonetheless, the child also had a bond with Mother and with James.  According to the Department's visitation monitor, H.W. was attached to Mother, who was loving and attentive to the children during the twice weekly visits—visits that Mother never missed.  Even the foster mother, who described the Mother's caretaking skills in less than complementary terms, admitted that Mother and H.W. were attached.  The bond between the foster mother and the child was likely stronger than the bond between Mother and H.W.  This result could be expected, of course, given the nature of the placement – the child's young age, the length of time she had been in the foster parent's home, and the fact that the foster family provided for H.W.'s daily needs.  It appears the Department recommendation to terminate parental rights was driven by the Department's desire to promote the adoption of H.W. by the foster family.  In the Department's reports prepared during the proceedings, especially those submitted just prior to the termination of Mother's reunification services, the Department does not provide substantiated evidence of ongoing domestic violence involving Mother, of her failure to address her issues which led to the dependency proceedings or to comply with the case plan.  Instead the Department emphasized the bond between H.W. and her foster family, the fitness of that placement and the foster parent's wishes to adopt the child.

18

If the success of the relationship between the child and the foster parents and benefits provided to H.W. in the foster home in comparison with that offered by Mother's were the only matters the court was required to consider in assessing the merits of a section 388 petition, then we might agree with the dependency court's decision in this case. However, the relative bonds between the child and her Mother and H.W. and the foster family and the comparison of the households are not the only matters at issue, and they certainly are not dispositive factors. As the court in *Kimberly F.* observed "the bond to the caretaker cannot be dispositive . . . lest it create its own self-fulfilling prophecy." (*Kimberly F., supra,* 56 Cal.App.4th at p. 531; see also *In re Jasmon O., supra,* 8 Cal.4th at p. 418 ["the existence of a successful relationship between a foster child and foster parent cannot be the sole basis for terminating parental rights"].) Our Supreme Court has cautioned against focusing solely on the suitability of the foster care placement. "[A]s a matter of stare decisis, to interpret 'best interests' in terms of a simple comparison between two households is to contravene the role of section 388 as explained by the *Marilyn H.* court. Due process, said our high court, was satisfied in *Marilyn H.,* even against the claim that changed circumstances justified reunification, precisely because of the escape mechanism provided by section 388. . . . Clearly – unless the *Marilyn H.* court was just wasting ink and the existence of section 388 is only a sham to provide formal window dressing for a statutory scheme which is dead set against parental reunification after an unsuccessful 12 or 18-month review – the best interests standard cannot be a simplistic comparison between the natural parent's and the caretakers' households." (*Kimberly F., supra,* 56 Cal.App.4th at p. 530, citing *In re Marilyn H., supra,* 5 Cal.4th at p. 309; italics omitted.)

Here, the Mother's and H.W.'s relationship, and the other *Kimberly F.* factors – the seriousness of the problem and its resolution – militate in favor of additional reunification services for Mother. The presumption favoring natural parents and the benefit to H.W. of maintaining her bond to James also supported Mother's request for six months of services. (*In re Daijah T.* (2000) 83 Cal.App.4th 666, 674-675). Although each individual factor may not be enough to warrant additional reunification services, the

19

only reasonable inference from all of this evidence when considered together is that additional reunification services would be in H.W.'s best interests. Thus, we conclude the court erred in denying Mother's section 388 petition with respect to H.W.

The order denying Mother's section 388 petition must be reversed; and because we reverse the order denying the section 388 petition, the order terminating parental rights must also be reversed. (*In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1508.)

### DISPOSITION

The orders denying Mother's petition for modification and terminating her parental rights are reversed, and the matter is remanded to the juvenile dependency court. The court is directed to enter a new order granting Mother six months of reunification services unless the Department demonstrates based on new evidence of conditions and circumstances that arose after the denial of the section 388 petition on September 16, 2014, that the additional six months of reunification services would be detrimental to H.W. Father's appeal is dismissed.

IWASAKI, J.[*]

**We concur:**

**PERLUSS, P. J.**                    **ZELON, J.**

_____

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.